UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 139; INTERNATIONAL
UNION OF OPERATING ENGINEERS
LOCAL 420,

        Plaintiffs,

  v.                                      Case No. 2:16-cv-00590-JPS

BRAD SCHIMEL, in his official capacity as
Attorney General for the State of Wisconsin;
JAMES R. SCOTT, in his official capacity as
Chairman of the Wisconsin Employment Relations
Commission,

        Defendants.

---

## PLAINTIFFS' NOTICE OF MOTION, MOTION FOR PRELIMINARY INJUNCTION, AND MEMORANDUM IN SUPPORT THEREOF

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT Plaintiffs International Union of Operating Engineers Local 139 ("Local 139") and International Union of Operating Engineers Local 420 ("Local 420") (collectively, "the Unions") will and hereby do move this Court pursuant to Federal Rule of Civil Procedure 65 to grant a preliminary injunction barring Defendants Brad Schimel and James R. Scott (collectively, "the State") from enforcing Wisconsin Statutes §111.04(3)(a)(3) insofar as the statute prohibits the Unions from entering into voluntary agreements with Wisconsin employers that would require all bargaining unit employees, regardless of Union membership status, to pay a service fee for Union representation expenses.

1

This motion is based upon this Notice of Motion and Motion; the Memorandum of Points and Authorities attached hereto; the pleadings, papers, and other documents on file herein; and such further evidence or argument as the Court may properly consider at or before a hearing on this motion.

Dated: June 21, 2016

Respectfully submitted,

By: */s/ Stephen P. Berzon*

STEPHEN P. BERZON (CA Bar No. 46540)
SCOTT A. KRONLAND (CA Bar No. 171693)
ZOE PALITZ (CA Bar No. 275752)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone:     (415) 421-7151
Email: sberzon@altber.com
Email: skronland@altber.com
Email: zpalitz@altber.com

BENJAMIN I. SACHS (DC Bar No. 479092)
1525 Massachusetts Avenue
Cambridge, MA 02138
Telephone:     (617) 384-5984
Email: bsachs84@gmail.com

*Attorneys for Plaintiffs*

MARK A. SWEET (WI Bar No. 1024320)
JOHN M. LOOMIS (WI Bar No. 1014890)
Sweet and Associates, LLC
2510 East Capitol Drive
Milwaukee, Wisconsin 53211
Telephone:     (414) 332-2255
Email: msweet@unionyeslaw.com
Email: jloomis@unionyeslaw.com

*Attorneys for IUOE Local 420*

BRIAN C. HLAVIN (WI Bar No. 1044654)
Baum Sigman Auerbach & Neuman, Ltd.
c/o IUOE Local 139
N27 W23233 Roundy Drive
P.O. Box 130
Pewaukee, Wisconsin 53072
Telephone:     (312) 236-4316
Email: bhlavin@baumsigman.com

*Attorney for IUOE Local 139*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 2

    I.     The Unions' Representation of Wisconsin Workers ................................................ 2

    II.    The Unions' Representational Activities ................................................................. 3

    III.   The Unions' Service Fee Proposals ........................................................................ 5

ARGUMENT ....................................................................................................................... 6

    I.     The Unions Will Suffer Irreparable Harm in the Absence of a
          Preliminary Injunction. ......................................................................................... 6

    II.    The Unions are Likely to Succeed on the Merits .................................................. 10

    III.   The Balance of Equities and Public Interest Favor Issuance of a
          Preliminary Injunction. ......................................................................................... 12

CONCLUSION .................................................................................................................. 13

Case 2:16-cv-00590-JPS   Filed 06/21/16   Page 3 of 19   Document 9

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Ameritech Corp. v. McCann*,
   297 F.3d 582 (7th Cir. 2002) ...............................................................................................8

*Baskin v. Bogan*,
   983 F. Supp. 2d 1021 (S.D. Ind. 2014) ...........................................................................12

*Commc'ns Workers of Am. v. Beck*,
   487 U.S. 735 (1988)...........................................................................................................11

*Dibble v. Quinn*,
   793 F.3d 803 (7th Cir. 2015) .............................................................................................8

*Donohue v. Mangano*,
   886 F. Supp. 2d 126 (E.D.N.Y. 2012) ...............................................................................9

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Building & Constr. Trades Council*,
   485 U.S. 568 (1988).....................................................................................................11, 12

*FPC v. Hope Natural Gas Co.*,
   320 U.S. 591 (1944)...........................................................................................................12

*FPC v. Natural Gas Pipeline Co.*,
   315 U.S. 575 (1942)...........................................................................................................12

*Gacy v. Welborn*,
   994 F.2d 305 (7th Cir. 1993) ...........................................................................................10

*Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
   549 F.3d 1079 (7th Cir. 2008) ...........................................................................................9

*Haw. Hous. Auth. v. Midkiff*,
   467 U.S. 229 (1984).....................................................................................................11, 12

*Joelner v. Vill. of Washington Park, Ill.*,
   378 F.3d 613 (7th Cir. 2004) ...........................................................................................13

*Lineback v. Irving Ready-Mix, Inc.*,
   653 F.3d 566 (7th Cir. 2011) .............................................................................................9

*Midwest Title Loans, Inc. v. Ripley*,
   616 F. Supp. 2d 897 (S.D. Ind. 2009), *aff'd*, 593 F.3d 660 (7th Cir. 2010) .....................12, 13

ii

*Oil, Chemical & Atomic Workers v. Mobil Oil Corp.*,
426 U.S. 407 (1976)..................................................................................10

*Preston v. Thompson*,
589 F.2d 300 (7th Cir. 1978) ......................................................................9

*Retail Clerks International Association, Local 1625 v. Schermerhorn*,
373 U.S. 746 (1963)..................................................................................10

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
490 U.S. 477 (1989)..................................................................................10

*Sweeney v. Pence*,
767 F.3d 654 (7th Cir. 2014) .........................................................2, 10, 11

*Turnell v. CentiMark Corp.*,
796 F.3d 656 (7th Cir. 2015) ......................................................................6

*Vaca v. Sipes*,
386 U.S. 171 (1967)....................................................................................8

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)........................................................................................6

**Federal Statutes**

29 U.S.C. § 159(a) ............................................................................................3

29 U.S.C. § 164(b) ..............................................................................1, 10, 11

**State Statutes**

2015 Wisconsin Act 1 ............................................................................ *passim*

Wis. Stats. § 111.04(3)(a) ...................................................................... *passim*

**Constitutional Provisions**

Fifth Amendment ..........................................................................................1, 11

Eleventh Amendment.........................................................................................8

**Other Authorities**

11A Wright & Miller, *Federal Practice and Procedure* § 2948.1 (3d ed. 2016)...........................9

Cynthia Estlund, *Are Unions A Constitutional Anomaly?*, 114 Mich. L. Rev. 169 (2015)...........10

Eric A. Posner, *The Regulation of Groups*, 63 U. Chi. L. Rev. 133 (1996) ...................................9

## INTRODUCTION

Plaintiffs Local 139 and Local 420 represent thousands of workers throughout Wisconsin. Federal law imposes on the Unions a duty to represent all workers in a bargaining unit, even those who choose not to be Union members, in negotiating and administering collective bargaining agreements ("CBAs"). Section 14(b) of the National Labor Relations Act ("NLRA") allows states to pass laws, commonly known as "right to work" laws, that prohibit labor unions and employers from entering into agreements requiring employees to obtain union "membership" as a condition of employment. In March 2015, the Wisconsin Legislature passed 2015 Wisconsin Act 1, which contains such a prohibition, stating that "[n]o person may require, as a condition of obtaining or continuing employment, an individual to . . . [b]ecome or remain a member of a labor organization." Wis. Stats. §111.04(3)(a)(2). But Act 1 goes further; it also prohibits agreements requiring employees to "[p]ay *any* dues, fees, assessments, or other charges or expenses of any kind or amount, or provide anything of value, to a labor organization." Wis. Stats. §111.04(3)(a)(3) (emphasis added).

The Unions' lawsuit contends that the NLRA preempts Wisconsin Statutes §111.04(3)(a)(3) because this provision goes beyond prohibiting mandatory union "membership" and instead bans *all* fee agreements, including those that merely require employees to pay their fair share of union representational costs (as opposed to the cost of political, institutional, or other non-representational activities). The Unions also contend that interpreting the NLRA to authorize state bans on service fees would allow a violation of the Takings Clause of the Fifth Amendment, which Congress could not have intended.

The Unions seek a preliminary injunction to prelude the State from enforcing Wisconsin Statutes §111.04(3)(a)(3). The Unions have CBAs that are about to expire, and negotiations are commencing for successor contracts. The new Wisconsin law would prevent the Unions from including service fee provisions in their successor CBAs. Absent a service fee requirement, Unions will suffer irreparable harm when their contracts expire.

1

The Unions acknowledge that the Seventh Circuit in *Sweeney v. Pence*, 767 F.3d 654 (7th Cir. 2014), recently rejected, 2-1, similar legal arguments to the ones the Unions raise here. For the reasons articulated below, the Unions contend that *Sweeney* was wrongly decided and should be overruled. If this Court concludes, however, that it is bound by *Sweeney* to deny the Unions' preliminary injunction motion, then the Court should promptly deny this motion without oral argument so that the Unions can seek relief from the Seventh Circuit en banc or the U.S. Supreme Court.

**BACKGROUND**

**I.      The Unions' Representation of Wisconsin Workers**

Plaintiff Local 139. Plaintiff Local 139 represents approximately 9,000 working men and women in Wisconsin. *See* Declaration of Terrance McGowan ("McGowan Decl.") at ¶ 2. Local 139's operating engineers build and maintain Wisconsin's major industrial and infrastructure systems, including its tunnels, bridges, ports, airports, pipelines, power plants, paper mills, and other manufacturing facilities. *Id*. Local 139, which has been representing Wisconsin workers since 1902, currently has six master CBAs, which apply to the employees of approximately 2,500 Wisconsin employers. Local 139 also has approximately one hundred independent CBAs with individual employers throughout Wisconsin. *Id*. at ¶¶ 2-3.

Prior to Act 1, Local 139 had in each of its CBAs a union security clause that required all bargaining unit employees, as a condition of employment, to pay their fair share for the cost of representation. *Id*. at ¶ 5. This provision requires bargaining unit employees who chose not to be Union members to pay only for the Union's representational activities (as opposed to its political, institutional, or other non-representational activities). Local 139 members pay full Union dues and fees. *Id*.

Each of Local 139's CBAs is renegotiated approximately every three to five years. *Id*. at ¶ 3. In the next few months, Local 139 will begin collective bargaining for its largest master agreement, a state-wide CBA covering approximately 3,000 workers and 600 employers. *Id*. at ¶ 6. Other CBAs will also be open for negotiations in the coming months. *Id*.

2

<u>Plaintiff Local 420</u>.  Plaintiff Local 420 represents approximately 2,000 working men and women in Wisconsin.  *See* Declaration of Mark Maierle ("Maierle Decl.") at ¶ 2.  Local 420's stationary engineers operate and maintain the physical plant systems in hotels, schools, hospitals, commercial buildings, and industrial complexes.  *Id*.  Local 420 was formed in 2012 by the merger of three local unions, which together had represented Wisconsin workers for a combined 200 years.  *Id*.

Local 420 has sixteen CBAs with Wisconsin employers, each of which must be negotiated approximately every three or four years.  *Id*. at ¶ 3.  Prior to Act 1, Local 420 had in each of its CBAs a clause that required all employees, as a condition of employment, to pay their fair share for the cost of Local 420's representation.  *Id*. at ¶ 5.  Local 420 members were required to pay full Union dues and fees.  Any bargaining unit employees who chose not to be members of Local 420 were required to pay only for the Union's representational activities (as opposed to its political, institutional, or other non-representational activities).  *Id*.

In April 2016, after Act 1went into effect, Local 420 entered into a new CBA with one of its signatory employers.  *Id*. at ¶ 6.  The previous CBA between Local 420 and this employer required all bargaining unit employees to pay for Local 420's representation.  *Id*.  Because a new contract was entered into after the effective date of Act 1, nonmembers are no longer required to pay for the services the Union provides to them.  *Id*.

In the next month, Local 420 will begin negotiations for a successor CBA with its largest signatory employer, which employs 900 workers represented by the Union.  *Id*. at ¶ 7.  Other CBAs will also be open for negotiations in the coming months.  *Id*.

## II.     The Unions' Representational Activities

Under the NLRA, the majority of workers in a bargaining unit may democratically choose union representation.  29 U.S.C. §159(a).  Once elected the "exclusive representative" of a particular bargaining unit, the Unions must and do devote significant financial and human resources to representing every employee, regardless of Union membership.  McGowan Decl. at ¶ 7; Maierle Decl. at ¶ 8.

3

Collective bargaining involves a significant expenditure of the Unions' resources. For example, negotiations for each of Local 139's master CBAs typically involves several months of labor-management meetings, for which a bargaining team of Union officers and staff prepares extensively. McGowan Decl. at ¶ 7. During negotiations, Local 139 often obtains assistance from outside legal counsel to review draft proposals and conduct legal research. *Id.* Local 420 provides multi-day trainings for its bargaining teams with presentations from lawyers and expert negotiators on critical bargaining skills. Maierle Decl. at ¶ 8. Local 420 sends out surveys to each member of the bargaining unit to solicit feedback on what changes employees would like to see in the upcoming contract. *Id.* Local 420 compiles and reviews the survey results and uses them in developing its bargaining positions. *Id.* Bargaining itself often involves day-long meetings, three days per week, for several months. *Id.* The wage increases, health and retirement benefits, and other job protections negotiated by the Unions apply equally to all bargaining unit employees, regardless of whether they choose to be Union members. McGowan Decl. at ¶ 7; Maierle Decl. at ¶ 8.

Both Unions also spend significant resources on contract administration, which includes ensuring that the CBAs are properly implemented, investigating employee complaints, and processing grievances. McGowan Decl. at ¶ 8; Maierle Decl. at ¶ 9. Local 139 employs a staff of 33 business agents, whose primary job duty is contract administration. McGowan Decl. at ¶ 8. Those 33 business agents drive Union-supplied cars all over the state, visiting job sites, conducting safety inspections, discussing employee concerns, and meeting with management to resolve disputes. Each business agent drives, on average, 60,000 miles per year for official business due to the remote locations of many job sites. *Id.* Local 420 also employs business agents, who are responsible for negotiating with management over workplace disputes, answering employee questions, conducting workplace visits, and supervising a team of approximately 60 shop stewards. Maierle Decl. at ¶ 9.

The Unions' business agents are also involved in grievances the Unions file on behalf of employees for discipline, discharge, or other violations of their CBAs. The business agents

spend many hours per week processing grievances by interviewing witnesses, drafting employee statements, and negotiating with management. If a business agent is unable to resolve a grievance, it may be referred to binding arbitration paid for by the respective Union, for which outside counsel may be retained. McGowan Decl. at ¶ 9; Maierle Decl. at ¶ 10. Arbitration costs are significant. In addition to the cost of attorneys, expert witnesses, and compensating other witnesses for lost wages, independent arbitrators in Wisconsin routinely charge $4,500 - $10,000 for a labor arbitration. McGowan Decl. at ¶ 9.

The Unions' contract administration and grievance handling services are provided equally to all members of the bargaining unit, regardless of Union membership. McGowan Decl. at ¶ 10; Maierle Decl. at ¶ 11.

### III. The Unions' Service Fee Proposals

As stated, prior to Act 1, all of the Unions' CBAs included union security provisions. After Act 1 became effective, Local 139 proposed to several Wisconsin employers to enter into a new Fair Representation Fee Agreement, which would require all employees in the bargaining unit, regardless of Union membership status, to pay a service fee to the Union for the cost of Local 139's representation. McGowan Decl. at ¶ 11. Eight employers signed the Fair Representation Fee Agreement with Local 139, but the agreement expressly states that it will not be enforced unless a court determines that Wisconsin Statutes §111.04(3)(a)(3) is invalid insofar as it bars this type of service fee agreement. *Id*., Exhibits A-H (Fair Representation Fee Agreements). Two employers, one of which employs over 1,500 workers represented by Local 139, stated that they could not enter into a Fair Representation Fee Agreement because of Act 1. *Id*. at ¶ 12.

Under the proposed Fair Representation Fee Agreements, service fees would be used by the respective Union solely to pay for costs related to negotiating and administering the CBA, including investigating and processing grievances. *Id*., Exhibit A (Fair Representation Fee Agreement) at ¶ 4. At the end of each calendar year, the Union would provide to all bargaining unit employees an accounting of how the service fees were spent. *Id*. at ¶ 5. The Union would

also provide annual notice to all bargaining unit members, as well as individual notice to all new hires, regarding the calculation of the fair representation fee and the employee's right to challenge the calculation of that fee, including the right to an appeal before an impartial arbitrator paid for by the Union. *Id*. at ¶ 6.

Local 139 represents the employees of over 2,600 Wisconsin employers in addition to the employers to whom it has already proposed entering into a Fair Representation Fee Agreement. McGowan Decl. at ¶ 14. Local 139 would like the opportunity to negotiate a Fair Representation Fee Agreement with each of the employers in Wisconsin with whom it has a CBA. *Id.* Local 139 would also like to include a service fee provision in each of its six master CBAs, which apply to thousands of workers. *Id.* Local 420 represents the employees of sixteen Wisconsin employers. Maierle Decl. at ¶ 12. Local 420 would like the opportunity to negotiate a Fair Representation Fee Agreement similar to Local 139's agreements with each of the employers in Wisconsin with whom it has a CBA. *Id.* If not for Wisconsin Statutes §111.04(3)(a)(3), each of the Unions could successfully negotiate and enforce Fair Representation Fee Agreements with Wisconsin employers. McGowan Decl. at ¶ 15; Maierle Decl. at ¶ 12.

## ARGUMENT

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see also Turnell v. CentiMark Corp*., 796 F.3d 656, 661 (7th Cir. 2015).

### I. The Unions Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction.

Wisconsin's law went into effect in March 2015. *See* 2015 Wisconsin Act 1 ("Act 1"). Pursuant to Section 13 of Act 1, however, the prohibition of service fee agreements "first applies . . . upon the renewal, modification, or extension of the agreement occurring on or after the effective date of this subsection." Thus, Act 1 does not become operative with respect to a

6

particular bargaining unit until the current CBA expires or is modified. At the time Act 1 was enacted, each of the Unions' CBAs included a union security provision that required all bargaining unit employees to pay their fair share for the Unions' representation. McGowan Decl. at ¶ 5; Maierle Decl. at ¶ 5. Until the expiration of these CBAs, bargaining unit employees are required to pay fair share fees.

The Unions' CBAs are now beginning to expire. In April 2016, Local 420 entered into a successor CBA with one of its sixteen signatory employers. Maierle Decl. at ¶ 6. The previous CBA between Local 420 and this employer required all bargaining unit employees to pay their fair share for the cost of Local 420's representation. Because Local 420 entered into a new contract after the effective date of Act 1, nonmembers in this bargaining unit can no longer be required to pay for the services the Union must provide. The April 2016 agreement will be in effect for the next four years. *Id.*

In the next month, Local 420 will begin negotiations for a successor CBA with its largest signatory employer, which employs 900 workers represented by the Union. *Id.* at ¶ 7. The current CBA between Local 420 and this employer, which has been in effect for four years, requires bargaining unit employees to pay for Local 420's representational activities. If the Court does not enjoin the enforcement of Wisconsin Statutes §111.04(3)(a)(3), Local 420 will not be able to obtain a valid, enforceable service fee clause in its successor CBA. *Id.* Once the new CBA is ratified, Local 420 could be barred from renegotiating the agreement for several years. *Id.* Local 420 will be in the same situation for other bargaining units soon, as the Union's CBAs continue to expire. *Id.*

Similarly, Local 139 will soon begin collective bargaining for its largest master CBA, a state-wide agreement covering approximately 3,000 workers. McGowan Decl. at ¶ 6. Typically, this CBA has a five-year term. *Id.* The current master agreement requires all bargaining unit employees to pay their fair share for Local 139's representation. If the Court does not enjoin the enforcement of Wisconsin Statutes §111.04(3)(a)(3), Local 139 will not be able to obtain a valid, enforceable service fee clause in its successor CBA. Once the new CBA is ratified, Local 139

could be barred from renegotiating the agreement for several years. *Id.* Local 139 will be in the same situation for other bargaining units where CBAs will be expiring soon. *Id.*

Once these new CBAs become effective, Wisconsin Statutes §111.04(3)(a)(3) will apply with full force to the Unions' bargaining units. Any nonmembers in the bargaining units who have, until now, been required to compensate the Union for its services, will be automatically entitled to a free ride. The Unions, by contrast, will continue to be required by federal law to represent the nonmembers equally, and could face legal liability if they do not. *See Vaca v. Sipes*, 386 U.S. 171, 194-98 (1967). The Unions will continue to be required to answer nonmembers' questions, process their grievances, hire lawyers for their arbitrations, and spend the Unions' resources to ensure that nonmembers' interests are represented in negotiations with employers. Meeting these obligations without commensurate compensation will deplete the Unions' treasuries and make it more difficult for the Unions to do their work effectively.

Local 139 has tried to negotiate Fair Representation Fee Agreements with employers to avoid these harms. *See* McGowan Decl. at ¶ 11. But the agreements would become effective only if Wisconsin Statutes §111.04(3)(a)(3) is invalidated. *Id.*, Exhibit A (Fair Representation Fee Agreement) at ¶ 1. Other employers have refused to enter into Fair Representation Fee Agreements because of Act 1. *Id.* at ¶ 12.

There would be no way to remedy the financial harm suffered by the Unions from the enforcement of Wisconsin Statutes §111.04(3)(a)(3). Even if that provision is later invalidated, the Unions will never be able recover the service fees lost in the interim. Retroactive collection of fees from nonmembers would likely be either illegal (because there would have been no valid fair-share requirement in effect when the work was performed) or impracticable (because the cost of pursuing individual claims against nonmembers in court would exceed the amounts at issue). In addition, the State likely has immunity from any damages award. *See, e.g.*, *Ameritech Corp. v. McCann*, 297 F.3d 582, 586 (7th Cir. 2002) (Eleventh Amendment bars suits for damages against state officials in their official capacities); *Dibble v. Quinn*, 793 F.3d 803, 807 (7th Cir. 2015) ("Qualified immunity shields government officials from civil damages liability

unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct" (citation omitted)).

The State's ongoing enforcement of Wisconsin Statutes §111.04(3)(a)(3) will also cause the Unions to suffer significant nonmonetary harms. The International Union of Operating Engineers' experience in other states with so-called "right to work" laws shows that such laws cause dissention and decreased union membership because all workers have an incentive to "free ride." Maierle Decl. at ¶ 13; *see also* Eric A. Posner, *The Regulation of Groups*, 63 U. Chi. L. Rev. 133, 137-38 (1996) (in such a system, "each [individual] actor finds it rational to cheat"). As unions are forced to cut services or increase members' dues to cover the cost of representing nonmembers for free, the free riding problem becomes worse. Maierle Decl. at ¶ 13.

The Seventh Circuit has held that "a decline in the union's membership" is "sufficient to establish irreparable harm." *Lineback v. Irving Ready-Mix, Inc*., 653 F.3d 566, 570 (7th Cir. 2011). Similarly, losing current members and putting additional strains on the remaining members "also poses a serious risk to the organization's significant goodwill, which [the Seventh Circuit] ha[s] recognized can constitute irreparable harm." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc*., 549 F.3d 1079, 1089 (7th Cir. 2008) (holding that actions which would reduce the number of members, which would in turn reduce the plaintiff's "ability to generate revenues . . . need[ed] to cover its annual budget" constitutes irreparable harm). Because of the democratic nature of the Unions' status as exclusive representative, actions which "erode the relationship between the unions and their members," have also been found to cause the Unions irreparable harm warranting a preliminary injunction. *Donohue v. Mangano*, 886 F. Supp. 2d 126, 152 (E.D.N.Y. 2012). Moreover, the Seventh Circuit has noted that "[t]he existence of a continuing constitutional violation constitutes proof of an irreparable harm." *Preston v. Thompson*, 589 F.2d 300, 303 n. 3 (7th Cir. 1978); *see also* 11A Wright & Miller, *Federal Practice and Procedure* §2948.1 (3d ed. 2016) ("When an alleged deprivation of a constitutional right is involved . . . most courts hold that no further showing of irreparable injury is necessary.").

## II.     The Unions are Likely to Succeed on the Merits.

The Unions understand that the Seventh Circuit upheld a similar state law in *Sweeney*, and that this Court is bound by that ruling. *See Gacy v. Welborn*, 994 F.2d 305, 310 (7th Cir. 1993) ("[D]istrict courts [may not] disregard [Seventh Circuit] decisions."); *see also Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). But for the reasons stated immediately below, and for the reasons articulated in the *Sweeney* dissent, *Sweeney* was wrongly decided and should ultimately be reversed by the Seventh Circuit sitting en banc or by the Supreme Court.

*First*, Wisconsin's law is preempted because Act 1 prohibits more than mandatory union "membership," which is all that NLRA Section 14(b) allows states to ban. 29 U.S.C. §164(b). Where a state prohibits something *other* than an "agreement[] requiring membership in a labor organization," *id.*, it falls outside the scope of Section 14(b) and is preempted by federal law. *See Oil, Chemical & Atomic Workers v. Mobil Oil Corp.*, 426 U.S. 407, 413 n. 7 (1976) ("[R]ight-to-work laws which are not encompassed by §14(b) . . . are no[t] permissible.").

The Supreme Court decision in *Retail Clerks International Association, Local 1625 v. Schermerhorn*, 373 U.S. 746 (1963), makes clear that, under Section 14(b), states may prohibit union shop agreements — where all employees must become actual union members — as well as agency shop agreements — which require nonmembers to pay *the same* dues and fees as members and are therefore the "'practical equivalent'" of a membership requirement. *Id.* at 751 (quoting *N.L.R.B. v. Gen. Motors Corp.*, 373 U.S. 734, 743 (1963)). But Section 14(b) does not permit the states to go further. *See* Cynthia Estlund, *Are Unions A Constitutional Anomaly?*, 114 Mich. L. Rev. 169, 222 n.257 (2015) ("[*Retail Clerks*] expressly distinguished a hypothetical ban on union-security agreements [that] was 'less stringent' than those requiring the full financial equivalent of membership."). Act 1 goes further by prohibiting services fees that are not the "practical equivalent "of union dues, but simply compensation for the cost of negotiating and administering the CBA.

Moreover, the legislative history of Section 14(b) supports the conclusion that Congress

did not intend to allow states to prohibit all agreements that require payment of "*any* dues, fees, assessments, or other charges or expenses of *any* kind or amount." Wis. Stats. §111.04(3)(a)(3) (emphasis added). The Congress that enacted Section 14(b) aimed to address concerns associated with closed shop agreements, which prevented employers from hiring anyone who was not already a union member, but was "equally concerned . . . that without such agreements, many employees would reap the benefits that unions negotiated on their behalf without in any way contributing financial support to those efforts." *Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 748 (1988). Congress therefore "carefully tailored [its legislative] solution to the evils at which it was aimed" — ending the closed shop while "'recogniz[ing] the validity of unions' concerns about 'free riders,' . . . and gave unions the power to contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason.'" *Id.* at 749 (citation omitted). There is no indication that Congress viewed Section 14(b) as authorizing states to go *beyond* prohibiting mandatory union membership to outlaw service fee agreements for the cost of representation; and indeed, such an interpretation of Section 14(b) would have undermined one of Congress's two central concerns — preventing free-ridership.

      *Second*, before interpreting Section 14(b) to allow Wisconsin "to conscript the union into providing uncompensated services to anyone who decides to opt out of union membership, it would become necessary to decide whether [Wisconsin Statutes §111.04(3)(a)(3)] is permissible under the Takings Clause." *Sweeney*, 767 F.3d at 683-84 (Wood, J., dissenting).[1] The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. "'[O]ne person's property may not be taken for the benefit of another private person without a justifying public purpose, even though compensation be paid.'" *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 241 (1984) (citation omitted). "A purely

---

      [1] It is settled law that federal statutes, including the NLRA, should not be interpreted to raise serious constitutional issues where another interpretation is fairly possible. *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Building & Constr. Trades Council,* 485 U.S. 568, 575-77 (1988).

private taking c[an]not withstand the scrutiny of the public use requirement; it . . . serve[s] no legitimate purpose of government and [is] thus . . . void." *Id.* at 245.

The private property at issue here is the Unions' services, *i.e.* the significant time their employees spend bargaining and administering a CBA for the benefit of the entire bargaining unit (member and nonmember alike), including the cost of hiring outside counsel as necessary to process grievances and bring them to arbitration. Wisconsin Statutes §111.04(3)(a)(3) takes the Unions' private property by requiring them to donate their services to nonmembers for free. Even if a "public purpose" justifies requiring the Unions to provide services to nonmembers, the Constitution demands that the Unions be permitted to obtain fair compensation. *Midkiff*, 467 U.S. at 241; *see also, e.g.*, *FPC v. Hope Natural Gas Co.*, 320 U.S. 591, 602-03 (1944); *FPC v. Natural Gas Pipeline Co.*, 315 U.S. 575, 585-86 (1942) (defining "reasonable rates" for a public utility as those that are "not confiscatory in the constitutional sense"). As with a public utility, federal law requires the Unions to provide services to all bargaining unit members; so state law cannot, consistent with the Takings Clause, prohibit the Unions from demanding just compensation for those services. At the very least, there is a serious question whether the Takings Clause would prohibit an outcome in which the Unions are required to provide services for free. Therefore, consistent with *DeBartolo*, 485 U.S. at 575-77, the NLRA should not be interpreted to allow such a result. *See supra* n.1.

For these reasons, the Unions are likely to prevail on the merits in their challenge to Wisconsin Statutes §111.04(3)(a)(3).

### III. The Balance of Equities and Public Interest Favor Issuance of a Preliminary Injunction.

"Balancing harm to the parties and considering the public interest 'largely overlap' when a Plaintiff sues a government entity to enjoin enforcement of a statute. While the public has an interest in enforcing laws that promote safety or welfare, the public has no cognizable interest in enforcing laws that are unconstitutional." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd*, 593 F.3d 660 (7th Cir. 2010); *see also Baskin v. Bogan*, 983 F.

Supp. 2d 1021, 1029 (S.D. Ind. 2014) ("The State does not have a valid interest in upholding and applying a law that violates . . . constitutional guarantees."). "Indeed, the public interest is best served by preventing unconstitutional enforcement." *Ripley*, 616 F. Supp. 2d at 908; *see also Joelner v. Vill. of Washington Park, Ill.*, 378 F.3d 613, 620 (7th Cir. 2004) ("Surely, upholding constitutional rights serves the public interest."). Here, Wisconsin's law violates the Supremacy Clause; so the State has no cognizable interest in the continued enforcement of Wisconsin Statutes §111.04(3)(a)(3).

Moreover, prior to March 2015, it had always been the policy of Wisconsin to allow labor unions and employers to enter into voluntary agreements requiring employees to pay their fair share for union representation. Act 1 has been taking effect on a rolling basis, as CBAs signed prior to the law's effective date begin to expire. Enjoining the law pending resolution of this case would work no appreciable harm to the State, while preventing significant, irreparable harm to the Unions.

<u>CONCLUSION</u>

For the foregoing reasons, the Court should either grant the Unions' motion for a preliminary injunction or, if the Court concludes that the Unions' claims are barred by Seventh Circuit precedent, promptly deny the motion, so the Unions can appeal their request to a forum with the power to grant it.

Dated: June 21, 2016                    Respectfully submitted,

By: */s/ Stephen P. Berzon*

STEPHEN P. BERZON (CA Bar No. 46540)
SCOTT A. KRONLAND (CA Bar No. 171693)
ZOE PALITZ (CA Bar No. 275752)
Altshuler Berzon LLP
177 Post Street, Suite 300
San Francisco, California 94108
Telephone: (415) 421-7151
Facsimile: (415) 362-8064
Email: sberzon@altber.com
Email: skronland@altber.com
Email: zpalitz@altber.com

BENJAMIN I. SACHS (DC Bar No. 479092)
1525 Massachusetts Avenue
Cambridge, MA 02138
Telephone:     (617) 384-5984
Facsimile:     (617) 496-5156 (fax)
Email: bsachs84@gmail.com

*Attorneys for Plaintiffs*

MARK A. SWEET (WI Bar No. 1024320)
JOHN M. LOOMIS (WI Bar No. 1014890)
Sweet and Associates, LLC
2510 East Capitol Drive
Milwaukee, Wisconsin 53211
Telephone:     (414) 332-2255
Facsimile:     (414) 332-2275
Email: msweet@unionyeslaw.com
Email: jloomis@unionyeslaw.com

*Attorneys for IUOE Local 420*

BRIAN C. HLAVIN (WI Bar No. 1044654)
Baum Sigman Auerbach & Neuman, Ltd.
c/o IUOE Local 139
N27 W23233 Roundy Drive
P.O. Box 130
Pewaukee, Wisconsin 53072
Telephone:     (312) 236-4316
Facsimile:     (312) 236-0241
Email: bhlavin@baumsigman.com

*Attorney for IUOE Local 139*