# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 139 and
INTERNATIONAL UNION OF OPERATING
ENGINEERS LOCAL 420,

Case No. 16-CV-590-JPS

Plaintiffs,

v.

BRAD D. SCHIMEL,
JAMES R. SCOTT, and
ANTHONY ARNOLD,

ORDER

Defendants.

This case represents Wisconsin's chapter in the ongoing, national debate about the role that labor unions play in the modern workplace and the extent to which they may be regulated by both state and federal governments. In 2015, Wisconsin joined the ranks of many sister states when it passed its own species of a so-called "right to work" law. *See* WIS. STAT. § 111.04 (Supp. 2016) (enacted Mar. 9, 2015), *available at* https://docs.legis.wisconsin.gov/statutes/statutes/111/I/04 (last visited Sep. 9, 2016) ("Act 1"). In their complaint, the plaintiffs claim, under 42 U.S.C. § 1983, 29 U.S.C. § 158(a)(3), and Article III, § 2 of the United States Constitution, that a specific provision of that right to work law, WIS. STAT. § 111.04(3)(a)(3), is preempted by Section 14(b) of the National Labor Relations Act ("NLRA"), 29 U.S.C. §164(b) (2012), and violates the Fifth Amendment of the United States Constitution. (Docket #1 ¶ 1). The specific subsection at issue in this case—Section 111.04(3)(a)(3)—prohibits union-security agreements that require employees to "[p]ay any dues, fees,

assessments…to a labor organization." In short, therefore, neither union membership, nor the payment of "any dues"—including those related to collective bargaining, contract administration, and grievance processing—may be compelled from Wisconsin workers. WIS. STAT. § 111.04(3)(a)(1)-(3).

This case now comes before the Court on three motions: (1) the plaintiffs' motion for a preliminary injunction (Docket #9); (2) the defendants' motion for judgment on the pleadings (Docket #16); and (3) five alleged Amici's motion for leave to file an amicus brief (Docket #19). As more fully explained below, the disposition of this matter is largely controlled[1] by the Seventh Circuit's recent decision with respect to Indiana's right to work law. *See generally Sweeney v. Pence*, 767 F. 3d 654 (7th Cir. 2014).[2] On the basis of *Sweeney*, and for the reasons stated herein, the Court concludes that the defendants' motion for judgment on the pleadings should be granted in its entirety, thereby rendering the plaintiffs' motion for a preliminary injunction moot. Furthermore, as the Amici do not add any materially significant arguments to the resolution of this case, the Court will exercise its discretion in denying the motion for leave to file an amicus brief.

---

[1]Indeed, the litigants also acknowledge the same. (Docket #9 at 7; Docket #21 at 4-5, 12, 18-20; Docket #22 at 8).

[2]As explained in further detail below, the Seventh Circuit has ruled directly on the preemption claim at issue in this case; the takings claim was not presented on appeal, though the majority offered "considered dicta" on the topic. *See Reich v. Continental Casualty Co.*, 33 F.3d 754, 757 (7th Cir. 1994) (discussing the strong persuasive value of "considered dicta").

## 1.    BACKGROUND

Due to the unique posture of this case, the Court will first provide a brief summary as to where the matter stands both factually and procedurally. To that end, the following sections will be devoted to providing a overview of: (1) the parties in this case; (2) the relevant legal landscape; (3) the plaintiffs' challenge to Act 1; and (4) the Seventh Circuit's *Sweeney* decision.

### 1.1    The Parties

The plaintiffs are two unions that operate in the State of Wisconsin. (Docket #1 ¶¶ 7-8).[3] More specifically, the International Union of Operating Engineers Local 139 ("Local 139") and the International Union of Operating Engineers Local 420 ("Local 420") are labor organizations representing approximately nine thousand, and two thousand, working men and women in Wisconsin, respectively. (Docket #1 ¶¶ 7-8). Together, the unions are suing Brad Schimel—in his official capacity as Attorney General for the State of Wisconsin—and James R. Scott—in his official capacity as the chair of the Wisconsin Employment Relations Commission.[4] (Docket #1 ¶¶ 9-10).

The plaintiffs allege that, combined, they have represented the interests of Wisconsin workers for more than 200 years. (Docket #1 ¶ 20). As part of their duties, they each purport to spend significant financial and

---

[3]As this matter comes before the Court on the defendants' motion for judgment on the pleadings, the Court will rely solely on the facts contained in the complaint or answer. *See N. Indiana Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 452 (7th Cir. 1998) ("As the title of the rule implies, Rule 12(c) permits a judgment based on the pleadings alone.").

[4]According to the complaint, the Wisconsin Employment Relations Commission is responsible for enforcing and resolving disputes arising under Wisconsin Statutes § 111 *et seq.*, including Wisconsin's right to work law. (Docket #1 ¶ 10).

human resources representing every employee in the bargaining units for which they have been elected the "exclusive representative," union members and non-members alike. (Docket #1 ¶¶ 21-29). Each of the plaintiffs represent Wisconsin employees under the auspices of various collective bargaining agreements ("CBAs") with employers across the state. These CBAs are re-negotiated according to a specific time schedule every couple of years. (Docket #1 ¶ 22). The plaintiffs allege that their contract administration and grievance related services are available equally to all members of the bargaining unit, regardless of an individual's union membership status. (Docket #1 ¶ 30).

Prior to the enactment of Wisconsin's right to work law, each of the plaintiffs had, in each of their CBAs with Wisconsin employers, a union security clause that required *all* bargaining unit employees to pay their "fair share" for the union's representation, *i.e.*, what the Court will refer to hereinafter as "representation fees." (Docket #32). In other words, prior to Act 1, unions were permitted to charge non-union member employees in the bargaining unit for representation fees associated with: (1) CBA negotiation; (2) contract administration; and (3) grievance services. (Docket #1 ¶ 32). As a consequence of the enactment of Act 1, however, labor unions in Wisconsin have been prohibited from negotiating agreements that require employees pay representation fees. (Docket #1 ¶¶ 33-40).

As a result of this changed legal landscape, beginning in approximately May of 2016, Local 139 has proposed to several Wisconsin employers to enter into a "Fair Representation Fee Agreement" that contains

what is, in essence, a conditional representation fee provision.[5] (*See* Docket #1 ¶¶ 33-36). These agreements may only be enforced if Local 139 obtains a final judgment that Wisconsin's law cannot be applied to preclude their enforcement. (Docket #1 ¶¶ 33-36). Thus far, eight employers have signed such an agreement with Local 139. (Docket #1 ¶ 33). Two employers have refused to do so, citing Act 1. (Docket #1 ¶ 33). Though Local 420 does not purport to have entered into any similar type of agreements, it would like the opportunity to negotiate Fair Representation Fee Agreements with each of the employers with whom it has a CBA. (Docket #1 ¶ 39).

### 1.2    Act 1 and the NLRA

After a highly publicized and protracted political battle, the Wisconsin state legislature passed into law Act 1, which provides, *inter alia*, that:

> No person may require, as a condition of obtaining or continuing employment, an individual to do any of the following:
>
>> 1.    Refrain or resign from membership in, voluntary affiliation with, or voluntary financial support of a labor organization.

---

[5]According to the complaint, these provisions would require, as a condition of employment, all employees in the bargaining unit to pay a service fee to contribute to the cost of the union's representation. (Docket #1 ¶ 33). The service fees would purportedly be used by the respective union solely to pay for costs related to negotiating and administering the collective bargaining agreement, including investigating and processing grievances. (Docket #1 ¶ 34). At the end of each calendar year, the union would then provide to all bargaining unit employees an accounting of how the service fees were spent. (Docket #1 ¶ 35). The Union would also provide annual notice to all bargaining unit members, as well as individual notice to all new hires, regarding the calculation of the fair representation fee and the employee's right to challenge the calculation of that fee, including the right to an appeal before an impartial arbitrator paid for by the Union. (Docket #1 ¶ 35).

Case 2:16-cv-00590-JPS   Filed 09/26/16   Page 5 of 24   Document 25

2.      Become or remain a member of a labor organization.

3.      *Pay any dues, fees, assessments, or other charges or expenses of any kind or amount, or provide anything of value, to a labor organization.*

4.      Pay to any 3rd party an amount that is in place of, equivalent to, or any portion of dues, fees, assessments, or other charges or expenses required of members of, or employees represented by, a labor organization.

WIS. STAT. § 111.04(3)(a) (emphasis added). Here, the Unions do not dispute their inability to require employees' "member[ship]." *See* WIS. STAT. § 111.04(3)(a)(2). Rather, the plaintiffs challenge subsection (3), which precludes unions from obtaining reimbursement for service fees associated with union representation expenses (*i.e.*, those costs that accrue from collective bargaining, agreement administration, and grievance processing).

Without delving into the merits of the parties' arguments, a brief summary of relevant federal law—namely that which is embodied in Section 8(a) and 14(b) of the NLRA—is important. In 1935, the federal government intervened to regulate what had once been a tumultuous relationship between laborers and management through the passage of the NLRA (also known as the Wagner Act). *See* 49 Stat. 449, *as amended*, 29 U.S.C. § 151 *et seq.* In general, the NLRA established the right of workers to unionize and bargain collectively through a democratic system of exclusive representation. *See* 29 U.S.C. § 159(a). Flowing from this system of exclusive representation, the Supreme Court interpreted the NLRA to also impose upon unions a "corresponding duty…to exercise fairly the power conferred upon [them] [o]n behalf of *all* those for whom [they] act[], without hostile discrimination

against them." *Steele v. Louisville & N.R. Co.*, 323 U.S. 192, 203 (1944) (emphasis added); *see also Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–38 (1953) (extending duty of fair representation to the NLRA). In other words, "[t]he duty of fair representation requires the exclusive bargaining representative (*i.e.*, the union) to 'serve the interests of all members [of the bargaining unit] without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct.'" *Sweeney*, 767 F.3d at 672 (J. Wood, dissenting) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). This duty extends not only to the negotiation of CBAs, but to all union representational activity. *See Air Line Pilots Ass'n, Int'l v. O'Neil*, 499 U.S. 65, 67 (1991); *see also Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 221 (1977) ("The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones.…in carrying out these duties, the union is obliged fairly and equitably to represent all employees…union and nonunion, within the relevant unit.").

In 1947, "[c]oncerned that the Wagner Act had pushed the labor relations balance too far in favor of unions," *Chamber of Commerce v. Brown*, 554 U.S. 60, 67 (2008), Congress amended the NLRA through the Taft–Hartley Act. *See* 61 Stat. 136. On the one hand, various provisions contained in the NLRA—and specifically to Section 8(a)(3)—were aimed at combating the evils associated with the "closed shop," that is, a species of union-security agreement in which employers agreed to hire only those persons who were already union members. *See* 29 U.S.C. § 158(a)(3) ("It shall be an unfair labor practice for an employer…by discrimination in regard to hire or tenure or employment or any term or condition of employment to

Case 2:16-cv-00590-JPS   Filed 09/26/16   Page 7 of 24   Document 25

encourage or discourage *membership* in any labor organization.…[p]rovided, [t]hat nothing in this subchapter…shall preclude an employer from making an agreement with a labor organization…to require as a condition of employment *membership* therein.") (emphasis added); *see also Commc'ns Workers of Am. v. Beck*, 487 U.S. 735, 745-48 (1988) (collecting relevant legislative history and explaining that "[p]rior to the enactment of the Taft-Hartley Act…§ 8(a)(3) of the Wagner Act…permitted majority unions to negotiate 'closed shop' agreements requiring employers to hire only persons who were already union members"). On the other hand, the 1947 amendments to the NLRA also addressed Congress's "recogni[tion] that in the absence of a union-security provision 'many employees sharing the benefits of what unions are able to accomplish by collective bargaining will *refuse to pay their share* of the cost.'" *Id.* at 749 (quoting *NLRB v. Gen. Motors Corp.*, 373 U.S. 734, 740-41 (1963)) (emphasis added).

Despite this ban on the closed shop, "the amended Section 8(3) 'shield[ed] from an unfair labor practice charge less severe forms of union-security arrangements.…'" *Sweeney*, 767 F.3d at 659 (quoting *Gen. Motors Corp.*, 373 U.S. at 739).  Thus, for example, Section 8(a)(3) permits unions to collectively bargain for a "union shop," that is, "a workplace in which the employer is free to hire anyone, but new employees can be required to join the union after hire." *Id.* at 682 (J. Wood, dissenting). However, while Section 8(a)(3) permits union security agreements in which all employees must  become union "members" as a condition of continued employment, at the same time, "dues-paying *nonmember* employees" may not be compelled to fund "activities unrelated to collective bargaining, contract

Case 2:16-cv-00590-JPS   Filed 09/26/16   Page 8 of 24   Document 25

administration, or grievance adjustment….'" *Beck*, 487 U.S. at 738 (emphasis added). [6]

In what would eventually spawn decades of litigation regarding the interplay between federal and state labor regulations, the NLRA was also amended to include a related provision, namely, Section 14(b). *See* 29 U.S.C. § 164(b). This provision provides that "'nothing in this Act shall be construed as authorizing the execution or application of agreements requiring *membership* in a labor organization as a condition of employment *in any State or Territory in which such execution or application is prohibited by State or Territorial law.*" 29 U.S.C. § 164(b) (emphasis added). According to the Supreme Court, Section 14(b) "was designed to prevent other sections of the Act from completely extinguishing state power over certain union-security arrangements." *Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 373 U.S. 746, 751 (1963) ("*Retail Clerks I*"); *see also Retail Clerks Int'l Ass'n, Local 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 101 (1963) ("*Retail Clerks II*") ("In light of the wording of [Section] 14(b) and this legislative history, we conclude that Congress in 1947 did not deprive the States of any and all power to enforce their laws restricting the execution and enforcement of union-security agreements."). And, though Section 8(3) and Section 14(b) "unquestionably…overlap to some extent," the Supreme Court left open the question of "[w]hether they are perfectly coincident…." *Retail Clerks I*, 373 U.S. at 751-52 (concluding that—under Section 14(b) and the rule announced

---

[6] In *Beck*, the distinction between "nonmembers" and "members" was indeed a relevant one. *Id.* at 758-61. Though the majority in *Sweeney* did not address this distinction, the dissent found it both relevant and instructive. *See Sweeney*, 767 F.3d at 673–84 (J. Wood, dissenting).

Case 2:16-cv-00590-JPS   Filed 09/26/16   Page 9 of 24   Document 25

in *General Motors Corp.*—states may ban "agency shop" agreements by which employees have an "obligation to pay initiation fees and regular dues,....*[w]hatever may be the status of less stringent union-security arrangements....*") (emphasis added).

### 1.3 The Plaintiffs Challenge Wisconsin Act 1

It is against the complex regulatory backdrop outlined above that the plaintiffs challenge Section 111.04(3)(a)(3). (Docket #1 ¶¶ 44-50). More precisely, the Unions argue that federal labor law—namely, the NLRA, 29 U.S.C. § 164(b)—preempts Section 111.04(3)(a)(3). (Docket #1 ¶¶ 44-47). Specifically, they argue that Section 111.04(3)(a)(3) prohibits unions from entering "into an agreement [with employers] that requires, as a condition of employment, that all employees in the bargaining unit, *regardless of membership status*, pay a service fee to cover the union's *representational* expenses," which they define as those "fair share" expenses that are solely dedicated to collective bargaining, contract administration, and grievance services. (Docket #1 ¶¶ 13, 30). And, since Section 111.04(3)(a)(3) attempts to regulate concerted activities that are arguably or actually protected or prohibited by the NLRA (namely, Section 14(b)), the plaintiffs claim that Act 1 is preempted and violates 42 U.S.C. § 1983.

Next, the plaintiffs argue that Section 111.04(3)(a)(3) effects an unconstitutional taking and violates the Fifth Amendment. (Docket #1 ¶¶ 48-50). They base this claim on the interplay between: (1) the unions' obligation under federal law to fairly represent all persons in the bargaining unit, and (2) Wisconsin's prohibition on the collection of representation fees. (Docket #1 ¶¶ 4, 48-50). In other words, the plaintiffs claim that in being compelled to provide equal representation services to non-dues-paying and non-

representation fee-paying persons within their bargaining unit, Act 1 effectuates a "taking" of their property. *See* U.S. Const. amend. V (providing that "private property [shall not] be taken for public use, without just compensation").

### 1.4    The Seventh Circuit Decides *Sweeney*

In *Sweeney*, the Seventh Circuit was presented with similar, though not identical, challenges to Indiana's right to work law. 767 F.3d at 654. Like Act 1, Indiana's statute prohibits employers from requiring an individual to: "(1) [b]ecome or remain a member of a labor union; [and] (2) [p]ay dues, fees, assessments, or other charges of any kind or amount to a labor organization.…" *Id.* at 657 (citing Ind. Cod. § 22-6-6-8). In a 2-1 decision, the Seventh Circuit affirmed the district court's dismissal of the case on the grounds that Section 8 of Indiana's right to work law was not preempted under the NLRA. *Id.* at 658. Though it was not necessary to the decision, the majority likewise concluded that the Indiana statute did not constitute a taking. *Id.*

With regard to the preemption issue, the majority first interpreted the text and legislative history of the NLRA to allow states wide latitude to regulate unions. *Id.* at 659–60. Focusing on the text of the NLRA, the court rejected the argument that Section 14(b) permits states ban only those union-security agreements that require "full membership," that is, agreements compelling employees to pay "full membership fee[s]" as opposed to agreements which limit the fees paid by nonmembers to representation fees. *Id.* at 660. To the contrary, relying on *Beck* and *General Motors, Corp.*, the majority interpreted the "financial core" of union "membership" under Section 8(a)(3) to comprise *only* the payment of "representation fees,"

Case 2:16-cv-00590-JPS   Filed 09/26/16   Page 11 of 24   Document 25

namely, "those fees germane to collective bargaining, contract administration, and grievance adjustment." *Id* at 661. Under this view, because: (1) "membership" under Section 8(a)(3) and 14(b) should be interpreted consistently; and (2) Section 14(b) allows states to prohibit agreements requiring "membership," then states "necessarily" have the power to "prohibit[] agreements that require employees to pay Representation Fees." *Id.* With regard to legislative history, the Court found persuasive the fact that at the time of the Taft-Hartley's passage in 1947, twelve states had right to work laws in effect, some of which included language similar to that which was presented in Section 8 of Indiana's right to work law. *Id.* at 662-63. Thus, having passed the NLRA at a time when right to work laws like Indiana's were in existence, Congress must not have intended to overrule such state conduct. *Id.* In sum, therefore, similar to the conclusion reached by the D.C. Circuit in 1982, *Int'l Union of the United Ass'n of Journeymen & Apprentices of the Plumbing & Pipefitting Indus. of the U.S. & Canada, Local Unions Nos. 141,229,681, & 706 v. N.L.R.B.*, 675 F.2d 1257, 1267–68 (D.C. Cir. 1982), the court concluded that the Indiana right to work law was not preempted under federal labor law. *Id.* at 665.

Second, though no arguments under the Fifth Amendment were advanced by the union plaintiffs on appeal, the majority also concluded that Indiana's right to work law did not work an unconstitutional taking because "the union is justly compensated by federal law's grant to the Union the right to bargain exclusively with the employer." *Id.* at 666. In other words, Indiana's right to work law did not constitute a taking because, under the NLRA, the plaintiffs' federal duty to fairly represent all unit employees

during the collective bargaining process was "compensated" by their exclusive "seat at the negotiation table." *Id.*

Chief Judge Wood, in dissent, reached two wholly distinct conclusions with respect to the preemption and takings issues. *Id.* at 671-85. The dissent first outlined the basic structure of the NLRA and presented the economic "free riding" problem that arises if certain persons in the bargaining unit receive federally mandated services (pursuant to the duty of fair representation) without having to pay the corresponding representation fees to cover those costs. *Id.* at 671-74. Applying *Phillips v. Washington Legal Foundation*, 524 U.S. 156 (1998), and *Brown v. Legal Foundation of Washington*, 538 U.S. 216 (2003), as analytical guideposts,[7] Chief Judge Wood began her analysis by explaining that because Indiana law compels one private party (namely, representation fee-paying union members) to give property to another private party (namely, non-representation fee-paying nonmembers), the Indiana law must be analyzed as a taking under the Fifth Amendment.[8]

---

[7] *Phillips* and *Brown* both addressed the fate of interest income generated by funds contained in lawyers' trust accounts (IOLTA's). In those cases, the Court concluded that: (1) income generated on those accounts were indeed the private property of clients, 524 U.S. at 160, 538 U.S. at 217; and (2) any action transferring that private property into the hands of another must be analyzed under the takings framework, 524 U.S. at 172, 538 U.S. at 235.

[8] Indeed, Chief Judge Wood acknowledged the obvious distinction between the subject matter of the IOLTA cases (namely, money), and the subject matter of the unions' dispute, (namely, services), but concluded that distinction was one without a difference. *Sweeny*, 767 F.3d at 674-76. After all, as acknowledge by Justice Scalia in *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 556 (1991) (concurring in judgment in part, dissenting in part), services too have economic value and can therefore suffer from the paradigmatic common good or "free riding" problem. *Id.*

Although neither the text of Section 14(b) nor the language in the Supreme Court's NLRA jurisprudence answered the precise legal question presented by the parties, Chief Judge Wood analyzed the text of the NLRA, case law, and the legislative history of the NLRA to reach the conclusion that Section 14(b) preempted Indiana's right to work law. *Sweeney*, 767 F.3d at 680. At bottom, Chief Judge Wood relied on a different interpretation of *Beck*, *General Motors, Corp.*, *Retail Clerks I*, and *Retail Clerks II* to conclude that requiring a person employed under the auspices of a CBA to pay their "fair share" for services related to collective bargaining and contract administration is not enough to deem that person a union "member" as that term is used in Section 8(a)(3) and 14(b). *Id.* at 678-81. In this way, the dissent maintained a distinction between what may and may not be compelled of union "members," as opposed to non union "members," all while arguably maintaining a balance between: (1) a union's federal duty to represent both members and nonmembers equally; and (2) an employee's right to refrain from having to join the union as a full dues-paying member. The virtue of such an interpretation, according to the dissent, is that it not only comported with the text of the NLRA, but it also satisfied the court's duty to avoid interpreting statutes in such a way as to create a constitutional takings problem. *Id.* at 684-85.

Approximately six months after the Seventh Circuit decided *Sweeney*, Wisconsin passed Act 1.

2.    LEGAL STANDARD

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c); *see also Bartlett v. City of Chicago Sch. Dist. #299*, 40 F. Supp. 3d 959, 963 (N.D.

Ill. 2014) ("A Rule 12(c) motion for judgment on the pleadings permits a party to move for judgment after both the plaintiff's complaint and the defendant's answer have been filed."). "Only when it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved will a court grant a Rule 12(c) motion." *Moss v. Martin*, 473 F.3d 694, 698 (7th Cir. 2007).When ruling on such a motion, the Court must "take the facts alleged in the complaint as true, drawing all reasonable inferences in favor of the plaintiff." *Pisciotta v. Old Nat. Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007).

3.     ANALYSIS

The plaintiffs argue that Act 1: (1) is preempted by the NLRA; and (2) effects an unconstitutional taking under the Fifth Amendment. (*See generally* Docket #1). The parties do not dispute, and the Court agrees, that *Sweeney*'s holding with respect to the preemption claim and considered dicta with respect to the takings claim all but control the disposition of the motions that now come before this Court. *See Reich*, 33 F.3d at 757 (explaining that in the case of recent, considered dictum, "it would be reckless to think the Court likely to adopt a contrary view in the near future. In such a case the dictum provides the best, though not an infallible, guide to what the law is, and it will ordinarily be the duty of a lower court to be guided by it."). Accordingly, this Court concludes, under the holding and reasoning announced by the majority in *Sweeney*, that Act 1: (1) is not preempted by the NLRA; and (2) does not work an unconstitutional taking. The defendants' motion for judgment on the pleadings will, therefore, be granted, and the plaintiffs' motion for a preliminary injunction will be denied as moot.

Nonetheless, the defendants also argue that this Court should refrain from ruling on the plaintiffs' takings claim because it is not "ripe." (Docket #21 at 13-18). Though this may be an academic question at this juncture in the litigation (indeed, the defendants argue that even if the claim is ripe, they prevail under *Sweeney*, a conclusion with which this Court agrees), the Court finds the most prudent course is to address the ripeness issue.[9] For the reasons outlined below, the Court concludes that the plaintiffs' takings claim is indeed ripe.

The Fifth Amendment, made applicable to the states by the Fourteenth Amendment, provides that no "private property [shall] be taken for public use, without just compensation." U.S. CONST. amend. V. "While it confirms the State's authority to confiscate private property, the text of the Fifth Amendment imposes two conditions on the exercise of such authority: the taking must be for a 'public use' and 'just compensation' must be paid to the owner." *Brown*, 538 U.S. at 231-32. However, "[t]he Fifth Amendment does not proscribe the taking of property; it proscribes taking *without just compensation*." *Williamson Cnty. Reg'l Planning Comm'n.*, 473 U.S. at 194

---

[9]The plaintiffs suggest the Court need not address the defendants' argument that their takings claim is unripe because the doctrine announced in *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson Cnty.*, 473 U.S. 172, 194 (1985) (explained in further detail below), is prudential, rather than jurisdictional, in nature. (Docket #22 at 11). Indeed, the Court has confirmed that it decided *Williamson Cnty.* with prudential, rather than jurisdictional, concerns in mind. *See Forseth v. Vill. of Sussex*, 199 F.3d 363, 368 n.7 (7th Cir. 2000) (*citing Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 733 n.7 (1997)). However, while "ripeness 'is drawn from both Article III limitations on judicial power and from prudential reasons…[,]' *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993), the prudential nature of the test does not give 'the lower federal courts license to disregard' it." *Murphy v. Vill. of Plainfield*, 918 F. Supp. 2d 753, 760 (N.D. Ill. 2013) (quoting *Peters v. Vill. of Clifton*, 498 F.3d 727, 734 (7th Cir. 2007)).

Case 2:16-cv-00590-JPS   Filed 09/26/16   Page 16 of 24   Document 25

(emphasis added). "This principle makes clear that, ordinarily, compensation, not an injunction, is the appropriate remedy for a taking that satisfies the public use requirement." *Peters*, 498 F.3d at 731 (citing *Patel v. City of Chicago*, 383 F.3d 569, 574 (7th Cir. 2004)).

In general, the "exhaustion of state administrative remedies [is] not…required as a prerequisite to bringing an action pursuant to § 1983." *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 516 (1982); *see also Wudtke v. Davel*, 128 F.3d 1057, 1063 (7th Cir. 1997) ("[T]here is no general exhaustion requirement for § 1983 plaintiffs."). However, in the context of claims under the Takings Clause, "[b]ecause '[n]o constitutional violation occurs until just compensation has been denied,' *Williamson Cnty.*, 473 U.S. at 195 n.13,…a special ripeness doctrine…applies…." *Peters*, 498 F.3d at 731. Under this prudential ripeness doctrine—which was formally articulated by the Supreme Court in *Williamson County*—federal courts are precluded "from adjudicating land use disputes until: (1) the regulatory agency has had an opportunity to make a considered definitive decision[;] and (2) the property owner exhausts available state remedies for compensation." *Forseth*, 199 F.3d at 368.

However, the principles announced in *Williamson County* are not iron clad, and "[d]espite the strong presumption that damages, not injunctive relief, is the appropriate remedy in a Takings Clause action…there are limited circumstances in which injunctive relief is available." *Id.* For this reason, the Supreme Court has recognized certain exceptions to the two-prong ripeness test, which commonly arise in the context of cases in which injunctive and/or declaratory relief is sought. *See, e.g.*, *Daniels v. Area Plan Com'n of Allen Cnty.*, 306 F.3d 445, 449 (7th Cir. 2002) (seeking a declaration

Case 2:16-cv-00590-JPS   Filed 09/26/16   Page 17 of 24   Document 25

under Section 1983 that a certain zoning plan violated the Takings Clause); *see also Williamson Cnty.*, 473 U.S. at 193-94 (distinguishing the applicability of the ripeness doctrine in remedial cases, such as where "an aggrieved property owner…seek[s] a declaratory judgment regarding the validity of zoning and planning actions"). More specifically, if the pursuit of state court relief would be futile, plaintiffs are not required to seek state court intervention. *See Peters*, 498 F.3d at 732 (citing *Daniels*, 306 F.3d at 456). In other words, "[i]f a property owner demonstrates that state procedures for obtaining just compensation are either unavailable or inadequate, the claim is immediately ripe in federal court." *Id.* In addition, the "Supreme Court has held that many facial challenges to legislative action authorizing a taking can be litigated immediately in federal court." *Id.* (citing *San Remo Hotel, L.P. v. City & Cnty. of San Francisco*, 545 U.S. 323, 345 (2005); *Yee v. City of Escondido*, 503 U.S. 519 (1992)); *see also Holliday Amusement Co. of Charleston v. South Carolina*, 493 F.3d 404, 406-07 (4th Cir. 2007) ("[T]he state procedures requirement does not apply to facial challenges to the validity of a state regulation."). "Such 'facial' challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed, but face an 'uphill

battle.…'" *Suitum*, 520 U.S. at 736 n.10 (citing *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470, 495 (1987)).[10]

Here, it is undisputed that the plaintiffs have not sought any form of relief from Wisconsin state courts and, therefore, fail to satisfy either prong of the *Williamson County* ripeness test. Nonetheless, for the reasons described below, the Court concludes that *Williams County* is inapplicable in this case because the plaintiffs' allegations are best understood as comprising a facial challenge to Act 1.

In order to mount a facial attack in the takings context, a claimant must allege that the "mere enactment" of a statute violates the Takings Clause of the Fifth Amendment. *Keystone*, 480 U.S. at 494 (describing "an important distinction between a claim that the mere enactment of a statute

---

[10]The parties also dispute whether a third exception to *Williamson County* applies, *i.e.*, whether claims that allege a taking for a private purpose are exempt from the ripeness doctrine. (Docket #21 at 15 n.3; Docket #22 at 11-13; Docket #24 at 6-9); *cf. Sweeney*, 767 F.3d 674 (construing the plaintiffs' Takings Clause claim as a "private use" claim). Indeed, while other Courts of Appeal have concluded that "private use" takings claims need not comply with the *Williamson County* ripeness requirements, *see Carole Media LLC v. New Jersey Transit Corp.*, 550 F.3d 302, 308 (3d Cir. 2008) (collecting cases), this Court reads the Seventh Circuit's language in *Daniels* to preclude a similar conclusion. *See Daniels*, 306 F.3d at 453 ("Unlike some circuits, this Circuit has consistently maintained a strict requirement that Takings Clause litigants must first take their claim to state court even when plaintiffs, such as the Daniels, are alleging a taking for private purpose."). *But see Peters*, 498 F.3d at 732 (indicating potential tension with the language in *Daniels* by acknowledging that "it is well accepted that, when the government has taken property for a private, rather than a public, use, injunctive or declaratory relief may be appropriate"). Because the plaintiffs cannot avoid the application of *Williams County* under *Daniels*, it is unnecessary to address whether the plaintiffs' purported "private use" claim is exempt from the ripeness test articulated above.

constitutes a taking and a claim that the particular impact of government action on a specific piece of property requires the payment of just compensation"). In assessing a facial challenge, courts will look to the regulation's "'general scope and dominant features, leaving other specific provisions to be dealt with as cases arise directly involving them.'" *Garneau v. City of Seattle*, 147 F.3d 802, 807 (9th Cir. 1998) (quoting *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 397 (1926)). In order to prevail on a facial takings claim, a plaintiff must be able to establish that the piece of legislation in question "'deprived [the owner] of economically viable use of [his or her] property.'" *Suitum*, 520 U.S. at 736 (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 297 (1981)). And, the plaintiff must "establish that no set of circumstances exists under which the Act would be valid." *Daniels*, 306 F.3d at 467.

In this case, the Court reads the substance of the plaintiffs' allegations as comprising a facial attack on Act 1. At bottom, they argue that Act 1 categorically prohibits them from lawfully seeking compensation from nonmembers operating under CBAs across the state for services that the unions are compelled to render to them under federal law. (Docket #1 ¶¶ 3-4, 16-18, 37, 40-43). In other words, so long as Act 1 remains "on the books," there are "no set of circumstances" in which the plaintiffs may obtain "just compensation" for services that they are compelled to give. *Daniels*, 306 F.3d at 467; *see also Carole Media LLC*, 550 F.3d at 308 (describing how the exceptions to the *Williamson County* ripeness doctrine exist because "forcing the plaintiff to pursue state 'remedial' procedures would be an exhaustion requirement, a requirement that *Williamson Cnty.* explicitly does not impose") (citing *Williamson County*, 473 U.S. at 193-94). And, merely by

enacting Act 1, the Wisconsin legislature allegedly deprived the plaintiffs, and unions across the state, from the opportunity to receive just compensation for these services, all of which constitute an appropriate basis for a facial challenge.

While the defendants argue that the plaintiffs cannot prove that Act 1 deprives the unions of "economically viable use of" their property (because no "taking" has occurred), such an argument is flawed for two reasons. First, predicating a ripeness ruling on the conclusion that no "taking" has occurred puts the cart before horse. In other words, the defendants cite to no binding precedent which holds that the threshold ripeness inquiry requires a full-blown merits analysis of the purported takings claim. Second, this Court is satisfied that the complaint sufficiently alleges that the plaintiffs' property, namely, their services, will be deprived of economic value if they are rendered for free. (Docket #1 ¶ 31). Indeed, the Supreme Court has acknowledged the economic value of the services that unions render to bargaining unit employees. *See Abood*, 431 U.S. at 221 ("The tasks of negotiating and administering a [CBA] and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones. They often entail expenditure of much time and money."); *see also Sweeney*, 767 F. 3d at 473 ("In our situation, the nonmember of the union will reap the benefits of being represented by the union during a grievance, for instance, but he will pay nothing for those benefits, which might include a lay representative, maybe even a lawyer, investigative services, and so on–all things that cost the union real dollars to provide."). Accordingly, properly

Case 2:16-cv-00590-JPS   Filed 09/26/16   Page 21 of 24   Document 25

read as a facial challenge to Act 1,[11] the Court concludes that the plaintiffs' takings claim is ripe for adjudication by this Court.[12]

On a final note, the Court must address an outstanding motion relating to the filing an amicus brief. (Docket #19). Amici Curiae Anthony Arnold, Randy Darty, Todd Momberg, Daniel Sarauer, and Daniel Zastrow are Wisconsin residents and private sector employees currently employed within bargaining units exclusively represented by a labor union. (Docket #19 at 2). They are not union members and they do not wish to be represented by a labor union or financially support a labor union. (Docket #19 at 2). Act 1, therefore, applies to each of these employees' respective bargaining units, and each employee wants Act 1 to be upheld and not ruled unconstitutional. (*See generally* Docket #19).

---

[11]Indeed, the Court acknowledges the defendants' assertion that the words contained in the plaintiffs' complaint state that, "as applied," Act 1 is preempted and constitutes an unconstitutional taking. (Docket #1 ¶¶ 46-47, 50). This language, however, does not control whether the substance of the complaint constitutes a facial or as-applied challenge. Indeed, the nature of the plaintiffs' claim indicates that not only will they suffer an economic loss as a result of Wisconsin Act 1, but so too will any union elected as the exclusive bargaining representative of Wisconsin workers. (*See* Docket #1 ¶ 16). While Act 1, certainly "applies" to the plaintiffs, so too does it equally "apply"—and work the same unconstitutional taking—on every other union in the state. Thus, this is not the multifactor "ad hoc, factual inquiry" described in *Keystone*. 480 U.S. at 495; *see also Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 894 (1992) ("Legislation is measured for consistency with the Constitution by its impact on those whose conduct it affects…[Therefore] the proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant").

[12]Because the Court concludes that the plaintiffs assert a facial challenge against Act 1, it need not address the parties' arguments regarding the futility doctrine.

A federal district court's decision to grant amicus status is discretionary. *Leigh v. Engle*, 535 F. Supp. 418, 420 (N.D. Ill. 1982) (citing 3A C.J.S. Amicus Curiae § 3). Relevant factors in determining whether to allow an entity the privilege of being heard as an amicus include whether the proffered information is "timely" or "useful." *Id.* While the Court certainly appreciates the unique perspective of the Amici, their proposed amicus brief adds no materially significant argument that was not or could not have been raised by the State, and "in effect merely extend[s] the length of the [State's] brief." *Ryan v. Commodity Futures Trading Comm'n*, 125 F.3d 1062, 1063 (7th Cir. 1997) ("The vast majority of amicus curiae briefs are filed by allies of litigants and duplicate the arguments made in the litigants' briefs.…"). The Seventh Circuit has concluded that "[s]uch amicus briefs should not be allowed." *Id.* Thus, in the interest of avoiding further delay and needless briefing, the Court will deny the Amici's request for leave to file an amici curiae brief. (Docket #19).

4.     CONCLUSION

In sum, the Court concludes that the majority opinion in *Sweeney* compels the Court to grant the defendants' motion for judgment on the pleadings in its entirety. (Docket #16). Further, it is on this basis that the Court will deny the plaintiffs' motion for a preliminary injunction as moot. (Docket #9). Finally, the Court will deny the Amici's motion for leave to file an amicus brief, as it provides no useful arguments related to the disposition of the outstanding motions. (Docket #19).

Accordingly,

IT IS ORDERED that the defendants' motion for judgment on the pleadings (Docket #16) be and the same is hereby GRANTED;

IT IS FURTHER ORDERED that the plaintiffs' motion for a preliminary inunction (Docket #9) be and the same is hereby DENIED as moot; and

IT IS FURTHER ORDERED that the motion for leave to file an amicus brief (Docket #19) be and the same is hereby DENIED.

The Clerk of the Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of September, 2016.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge

Case 2:16-cv-00590-JPS   Filed 09/26/16   Page 24 of 24   Document 25